**REYNOLDS METALS COMPANY,**
**Plaintiff,**

v.

**The CONTINENTAL GROUP,**
**INC., Defendant.**

**No. 76 C 4198.**

United States District Court,
N. D. Illinois, E. D.

July 6, 1981.

George M. Sirilla, John W. Malley, Allen Kirkpatrick, W. Warren Taltavull, Peter W. Malley, and Cushman, Darby & Cushman, Washington, D. C., John F. C. Glenn and Robert C. Lyne, Jr., Richmond, Va., Holland C. Capper, Chicago, Ill., for plaintiff.

James R. Sweeney, Ronald B. Coolley, Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill., John J. Kowalik, Glenview, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### MEMORANDUM OPINION

ROSZKOWSKI, District Judge.

This action was commenced in November, 1976 by Reynolds Metals Company charging The Continental Group with infringement of two U. S. Patents owned by Reynolds. The Continental Group filed a counterclaim alleging that both of Reynolds' patents are invalid because of an alleged prior patent owned by Continental and charging Reynolds with infringement of its patent. Reynolds, in turn, filed two counterclaims contending that Continental's patent is invalid and unenforceable and has not been infringed. Before the court is a ruling on the bench trial held in this case on April 21–25, 28–30, and May 5–6, 1980. For the reasons herein stated, this court finds in favor of plaintiff Reynolds.

### FINDINGS OF FACT[1]

#### THE PARTIES AND THEIR CONTENTIONS

Reynolds Metals Company, ("Reynolds"), plaintiff and counter-defendant, is a Delaware corporation with its principal place of business in Richmond, Virginia.

The Continental Group, Inc. ("Continental"), defendant and counter-plaintiff, is a

1. Any finding of fact which may be more properly termed a conclusion of law shall be deemed a conclusion of law.

New York corporation with its principal place of business in Chicago, Illinois.

Reynolds is the owner of the entire right, title, and interest to United States Patents Nos. 3,967,752 and 3,967,753 (the "Cudzik" patents '752 and '753) which issued on July 6, 1976.[2]

Continental is the owner of the entire right, title, and interest to United States Patent No. 4,051,976 (the "Perry" patent '976) which issued on October 4, 1977.[3]

The application for the Perry '976 patent claimed the benefit of U. S. Patent No. 3,843,011 (the "Perry" patent '011) filed on March 2, 1972.

Reynolds maintains that Continental's manufacture of Permatab ends or Pontiac ends under its Perry patent '976 infringes claims 1–3, 5, 6, 8–13, 16–21, 24, 29, and 31 of Reynolds' Cudzik '752 patent and claims 1–4, 7, 8, 10–12, 14, and 15 of Reynolds' Cudzik '753 patent as provided by Title 35 U.S.C. § 281.

Continental, on the other hand, contends that Reynolds' manufacture of Stay-On-Tabs ("SOT") under its Cudzik '752 and '753 patents infringes claims 1, 2, 4–6, 8–11, 14–19, 23–25, 27–32, 34, 35, 38, 39, and 50 of Continental's Perry patent '976 as provided by Title 35 U.S.C. § 281.

Reynolds, in its counterclaim, maintains that, if this court concludes that the claims of the '976 patent covers the structures manufactured by Reynolds under patents '752 and '753, then the claims of these three patents cover common subject matter

---

**2.** Cudzik patent '752 was filed on November 24, 1975; Cudzik patent '753 was filed on July 26, 1974.

The claims of the Cudzik '752 patent asserted by Reynolds to be infringed by Continental's manufacture and sale of the Pontiac end are claims 1–3, 5–6, 8–13, 16–21, 24, 29 and 31. Of these claims, claims 1 and 18 are independent claims and the rest of the claims depend from one or the other of those two claims.

The claims of the Cudzik '753 patent asserted by Reynolds to be infringed by Continental's manufacture and sale of the Pontiac ends are claims 1–4, 7–8, 10–12 and 14–15. Of these claims, claims 1 and 10 are independent claims and the rest of the claims depend from one or the other of those two claims.

The first patent application filed by Reynolds relates to the Cudzik '753 patent and was filed September 28, 1972. It issued on September 14, 1974 as the '038 patent. A reissue application of the '038 patent was later filed under the provisions of 35 U.S.C. § 251 but was abandoned in favor of an application that was a continuation-in-part of the September 28, 1972 application. Seven additional applications, making a total of ten applications containing over two hundred claims, were filed eventually resulting in the '752 and '753 patents which issued on July 6, 1976.

The first end developed by Reynolds, the Montana end, is disclosed in the '038 and '753 patents. A Montana end, as disclosed in the Cudzik '753 and '038 patents, was manufactured by Reynolds and, although operative, was a commercial failure. As a result of the lack of commercial acceptance, production of the Montana end was halted.

The Montana end is disclosed and claimed in both the '753 patent and the earlier issued '038 patent. Figures 1–13 of the '753 patent are identical to Figures 1–13 of the '038 patent. Moreover, the written description up to column 8, line 58 of the '753 patent is identical to the disclosure of the '038 patent. The '753 patent issued on application Serial No. 492,033 which was related to the application for the '038 patent through a continuation-in-part application.

The second end developed by Reynolds in 1974 is disclosed in the Cudzik '752 patent and was named the Stay-On-Tab or SOT end. The SOT end also comprises only two elements, a tab and a panel defined by a score. These two elements are substantially identical to the elements of the Cudzik '038 and '753 patents. In addition, however, all the tabs of the SOT ends include a second piece of metal to meet Reynolds' interpretation of the non-detach legislation. This second piece of material is softer and more ductile than the material of the body of the tab and serves to hold the tab to the end if the tab body breaks.

The '752 and '753 patents each include claims, specifically claims 7 and 25–27 of the '752 patent and claims 9 and 16 of the '753 patent, setting forth this second piece of material, but, since the ends manufactured by Continental do not include a second piece of material, these claims are not alleged by Reynolds to be infringed.

The claims of the '752 patent are similar to those of the '753 patent. The claims set forth an easy opening end wall, including a rupturable score, defining most of the periphery of a tear panel, and a non-detachable tab with additional language generally defining the score configuration and the manner in which the tear panel opens.

**3.** Perry patent '976 was filed on August 9, 1976.

so that the three patents are interfering under 35 U.S.C. § 291.

Additionally, Reynolds argues that all of the claims in the Perry '976 patent are invalid and/or unenforceable under 35 U.S.C. §§ 101, 102(a), (b), (c), (e), (f), (g), 103, 112, and 115 and seeks a declaratory judgment that the '976 Perry patent is invalid.

The following issues are before this court:

(1) Whether claims 1–3, 5, 6, 8–13, 16–21, 24, 29, and 31 of plaintiff's U. S. Patent No. 3,967,752 are valid under 35 U.S.C. §§ 101, 102, 103, 111, 112, 113, 115, 116, 121, 181, 184, 185, 291, and 292; and, if so, whether any of them have been infringed by the defendant, and whether the infringement was willful and deliberate;

(2) Whether claims 1–4, 7, 8, 10–12, 14, and 15 of plaintiff's U. S. Patent No. 3,967,753 are valid under 35 U.S.C. §§ 101, 102, 103, 111, 112, 113, 115, 116, 121, 181, 184, 185, 291, and 292; and, if so, whether any of them has been infringed by the defendant, and whether the infringement was willful and deliberate;

(3) Whether the plaintiff's U. S. Patent Nos. '752 and '753 and each and every claim thereof are valid or whether defendant's U. S. Patent No. 4,051,976 and each and every claim thereof are valid under 35 U.S.C. § 291; and

(4) Whether claims 3, 7, 12, 13, 20, 22, 26, 33, 36, 37, and 40–49 of defendant's U. S. Patent No. 4,051,976 are valid and enforceable; and, if so, whether any of them has been infringed by the plaintiff.

Because this court finds that Cudzik, the patentee of plaintiff's patent Nos. '752 and '753, was the first inventor as against Perry as to the subject matter in suit, we conclude that plaintiff's U. S. Patent Nos. '752 and '753 are valid and that claims 1–6, 8–13, 16–24, 29, and 31 of patent No. '752, and claims 1–8 and 10–15 of patent No. '753 have been infringed by defendant. Additionally, we conclude that defendant's patent No. 4,051,976 is invalid and unenforceable.

## THE BACKGROUND AND THE PATENTS IN SUIT

Both of the patents in suit concern non-detachable opening devices for beverage cans.

Since the early 1960's, the removable ring pull tab has been the means used most widely for opening beverage cans.[4]

The patents in suit are directed to the tops or ends[5] of beverage cans and are designed to replace the removable ring pull tab with a non-detachable lift tab, which has such benefits as reducing the litter of, and potentially hazardous edges of, the ring pull tabs, and aiding in energy conservation through recycling.

Samples of the Reynolds and Continental cross-accused devices now on the market are shown side-by-side below.

4. RING PULL

5. The words "end" or "end wall" are used in the industry to refer to the top end wall of the beverage can. The rest of the can is called the "can body." In the present case, the patented structure is the end of the can with the non-detachable opening device.

REYNOLDS            CONTINENTAL

 

The non-detachable tabs are operable, upon lifting, to completely form the pour opening in the can without requiring any finger push-in action on the top end wall of the container. The top end wall pour opening area is defined by a tear panel formed by a score or cut line with a lift tab connected to the end wall by a rivet located outside of the tear panel area.

To open the pour opening in the end wall, the lift tab is fully raised by the fingers from a horizontal position (or a position whereby the tab lies flat against the end wall) to the vertical position (or a position whereby the tab is perpendicular to the pour opening). The pour opening is produced by lifting the tab which causes the tear panel to be substantially completely severed from the top end wall and to be forced, or depressed, down into the can. After the pour opening is produced, the tab remains attached to the end wall and may be pushed back to its original horizontal, or flat, position out of the way of the pour opening.

Prior to the early 1960's, beverages were marketed in cans that required the use of a separate can-opening device to cut pour openings. Beginning in the early 1960's, Ermal C. Fraze and his company, Dayton Reliable Tool and Manufacturing Co., developed the rivet system used to secure the detachable pull tab to the tear panel.[6]

This Fraze-Dayton device included a scored (or cut) line in the beverage can end wall to form the tear panel. An integral rivet was secured within the tear panel near the center of the can end, and the pull tab was secured to this rivet. To produce the pour opening, the tab was lifted, which caused the score line to rupture and which released the pressure within the can. The tab was then pulled entirely off the can end. The current commercial production in this country of beverage cans using the Fraze-Dayton patent is estimated to be approximately 54 billion per year.

Because of the safety and environmental problems that resulted from the throwing away of this detachable pull tab, a need emerged to develop a non-detachable opening device for beverage cans. The need became particularly important in the face of local and state legislation banning cans with detachable opening devices.

For the next ten years or so, various companies and individuals sought to develop a solution to the problem. Several solutions were contemplated, including the de-

---

**6.** This device is commonly referred to as the ring pull tab which is shown in footnote 4, page 954 of this opinion.

velopment of an opening device which required a finger push-in action upon the area forming the pour opening. Although this concept was advocated and marketed, this solution ultimately failed to have any real impact.

### THE DEVELOPMENT OF REYNOLDS' CUDZIK PATENTS '752 AND '753

In August, 1971, Reynolds assigned the responsibility of inventing a non-detachable opening device for beverage cans to its employee, Daniel F. Cudzik.

By September 28, 1972, Cudzik filed a patent application for a beverage can nondetachable tab which would be disposed of at right angles to the greatest length of the tear panel. This device became known as the "Montana end" and was eventually incorporated into Cudzik's '753 patent in suit. An exemplary form of that structure is shown below.

Montana End
Cudzik U. S. Patent No. 3,967,753

FIG. 2

The principle of operation of the Montana end is that the user places his finger under the rear end of the tab and lifts it up which causes the front end of the tab to press down on the score line directly under the front end of the tab. Lifting the tab ruptures or severs the tear panel in a limited amount thereby venting the interior pressure of the can. Continued upward lifting of the tab (to a vertical position and beyond) presses the forward end of the tab farther down against the tear panel causing the entire panel to be depressed down into

the can. The initial rupture of the score line propagates away from the tab toward the periphery of the can and around the enlarged curved end of the tear panel to completely form the pour opening while simultaneously swinging the tear panel down from the end wall so as not to be in the way of the beverage when it discharges through the opening. The tab may then be pushed back approximately to its original flat position so as to be out of the way should the user drink the beverage directly from the can. The tear panel remains connected to the end wall through an unscored section (at the inner end of the pour opening) that also provides a hinge for the tear panel when it is swung down during opening.

While the Montana end was still in the experimental stage, Cudzik decided that the tab should be in line with the pour opening and not at right angles to it. That decision led to Cudzik's conception around October, 1974 of the improvements to the Montana end that became the commercially acceptable Stay-On-Tab end. These improvements were disclosed in his patent application filed December 4, 1974 Serial No. 529,461, and in his subsequent application Serial No. 634,-755 that became his '752 patent in suit. An exemplary form of that structure is shown below:

Stay-On-Tab End
Cudzik U. S. Patent No. 3,967,752

FIG. 20

The principle of operation of the Stay-On-Tab end is that the user places his finger under the rear end of the tab and lifts it up which causes the front end of the tab to press down directly on the tear panel in front of the rivet. This action causes the rivet to be lifted up so as to work with, rather than against, the pressure within the can and an initial rupture or severing of a limited segment of the score line to effect venting in the area immediately in front of the rivet and beneath the tab. Continued upward lifting of the tab (to a vertical position and beyond) causes the forward end of the tab to press down farther on the tear panel, depressing the tear panel into the can with the initial score line rupture propagating away from the rivet toward the periphery of the can, around the curved end of the tear panel, and then back to the tab. This action completely forms the pour opening while simultaneously swinging the tear panel down so as not to interfere with the discharging of the beverage through the opening. The tab may then be pushed back to its original flat position so that the user may drink the beverage directly from the can. The tear panel remains connected to the end wall through an unscored section (near the rivet and under the tab) that also provides a hinge for the tear panel when it is swung down during opening.

The Montana end and the Stay-On-Tab end have the following unique features in common:

They each include a lift tab that extends over only a small, minor portion of the tear panel and that, when lifted, fully opens a single tear panel by depressing the tear panel into the can to provide a large, unobstructed pour opening without requiring any finger push-in on the tear panel. After opening, the tab and tear panel remain on the end wall, and the tab may be conveniently returned to its original position and out of the way for drinking directly from the can.

The Stay-On-Tab end, however, includes the following improvements over the Montana end:

(a) The tip of the tab in the Stay-On-Tab end presses down directly on the tear panel itself, at a point spaced inwardly from the score line, whereas, in the Montana end, the tip of the tab presses down directly on the score line. It was found that premature, undesired initial rupture of the score line could occur in the Montana end as a result of bumps or impacts on the tip of the tab during handling and storage. The Stay-On-Tab end eliminated that problem.

(b) The Stay-On-Tab end enabled the tab to work with the pressure within the beverage can to facilitate the initial venting rupture of the score line. In the Montana end, the tab had to work against that interior pressure to effect the initial venting rupture. Thus, the Stay-On-Tab end reduced the strength requirement of the Montana lift tab so that it could more readily be made of aluminum. The tab of the Montana end was made of steel and that led to a rusting or so-called "galvanic action" problem when the steel tab was used with an aluminum end wall. The Stay-On-Tab eliminated that problem and also simplified recycling because it enabled the tab as well as the end wall to be made of aluminum.

(c) The hinge for the tear panel in the Stay-On-Tab end is located under the tab and terminates closely adjacent to the rivet to facilitate rupture propagation. These features enabled the tab of the Stay-On-Tab end to be disposed in alignment with the tear panel to provide a structure that was symmetrical and desirably closer in appearance to the ring pulls. In the Montana end, the hinge for the tear panel was located at a narrow inner end of the tear panel, not under the tab and farther away from the rivet, although disposed rearwardly of the tip of the tab.

Reynolds introduced the Stay-On-Tab end at the National Soft Drink Association convention held in Chicago in November, 1974. Thereafter, it began promoting the end and the first sales were made around the end of 1975. An article about the Reynolds' Stay-On-Tab end appeared in the January, 1976

issue of "Modern Packaging". That article was actually seen by Perry around February, 1976, six months before he filed his patent application that became the Perry '976 patent in suit.[7] The article, which was published on page 55 of the January, 1976 issue of "Modern Packaging", appeared as follows:

**Stay-on can opener**

Beverage canners in Florida are now testing an aluminum opening device for aluminum cans designed to stay on the container and do away with pull-tab litter problems. Other tests will follow, with large-order commercial availability six months after order placement. A small initial tooling charge will apply to users, but the supplier says cost thereafter will not exceed that of present ends. The Stay-on-tab is opened by lifting a tab and pulling it forward; the tab is then pressed back down to its initial position on the can, leaving the opening free. Since such cans are completely recyclable, the potential in re-used aluminum is increased. *Reynolds Metals Can Div.* (216)

Since being commercially developed, non-detach ends have taken over approximately 35% to 40% of the market, which is approximately that portion of the total market necessary to comply with non-detach laws. Reynolds has converted 63% of its production to the SOT end, since not all of its customers want SOT ends or are required by legislation to use them. And, Reynolds expended over one million dollars during the period of 1976–1978 for advertising the SOT end.

THE DEVELOPMENT OF CONTINENTAL'S PATENT '976

Early in 1975, Mr. Robert O'Donnell, then Vice President of the Can Manufacturing Division of Reynolds, gave Mr. Harry Peyser, then Director of Concept Development of Continental, an SOT end which Mr. Peyser gave to Wayne Chiappe, then Vice President of Research and Engineering of the Metal Division of Continental.

About the Spring of 1975, Mr. O'Donnell gave an SOT end to Mr. Fred Hoover, who was then Executive Vice President in

7. Perry's application for his '976 patent was filed on August 9, 1976.

charge of the can operations of Continental. Mr. O'Donnell indicated to Mr. Hoover that a license to make the end would be available. Mr. Hoover gave the SOT end to Mr. Chiappe and asked him to evaluate it to determine whether Continental could make it on their equipment. Continental could not consider the SOT end as a possible product to sell unless it could be made on their equipment and tooling, which was totally different from Reynolds' tooling and equipment. In order to determine whether Continental could produce the SOT end at a profit, Mr. Chiappe gave the end to Mr. Les Martin, then a research planner for Continental and asked him to determine the cost of making such an end. Mr. Martin gave the SOT end to Mr. Nick Khoury, an engineer employed by Continental, and asked him to have it evaluated by one of Continental's suppliers, Dayton Reliable Tooling and Manufacturing Company ("Dayton").

On August 13, 1975, Continental requested its tool supplier, Dayton Reliable, to quote the cost involved in converting existing Continental tooling to produce the Reynolds' end. For that purpose, Nick S. Khoury, a Continental engineer, furnished Dayton Reliable with a photocopy of the Reynolds' Stay-On-Tab end. Physical specimens of the Reynolds' end were thereafter sent to Dayton Reliable by letter dated September 10, 1975 from R. T. Hsu, Manager of End Design and Tooling at Continental. That letter stated, in part:

> Enclosed are two samples of the Reynolds' non-detachable end I discussed with you on the telephone 9/9/75. * * * * Please advise us as soon as possible on your new or revised cost and timing estimates for the design and building of the Minster tooling * * *

At a meeting between representatives of Continental and Dayton Reliable on September 18, 1975, about a week after Dayton

Reliable received the specimens of the Reynolds' Stay-On-Tab ends from Continental, and a month after receiving the photocopies of that end, Dayton Reliable for the first time had samples to show Continental of an end now asserted to be Dayton Reliable's. Dayton Reliable called that end the ECO (short for ecology end). The ECO end shown to Chiappe by Dayton Reliable while he was in Dayton was similar to the SOT end but with an off-center score and tab.[8]

At this time, Chiappe learned that the ECO end could be made on Continental's equipment with little difficulty whereas the SOT end, which included an additional or second piece of material in the tab, was unsuited for production on Continental's equipment without modification. At this time, Chiappe authorized Dayton Reliable to make a study of the ECO end to be sure that it was an end Continental could make at a profit.

On or about September 23, 1975, shortly after the meeting with Continental representatives, Dayton Reliable shipped 400 experimental ECO ends to Continental. These ends were then evaluated and tested by skilled engineers at Continental and compared with the Reynolds' Stay-On-Tab end.

The results of the comparative testing and evaluation by Continental's engineers, contained in an October 2, 1975 report, were that the ECO end was, for all practical purposes, the same as the Reynolds' Stay-On-Tab end except that the latter had a second piece of aluminum in the tab that enabled the Reynolds' tab to be flexed back and forth a greater number of times before breaking than the tab on the ECO end.

Thereafter, by letter dated October 10, 1975, Continental requested Dayton Reliable to convert the first set of Continental tooling for production of the ECO end.[9]

---

**8.** During the deposition of Fraze, it was stipulated by the attorney for Fraze and Dayton Reliable, and agreed to by Fraze, that the December 4, 1974 filing date for the Cudzik '752 (Stay-On-Tab) patent in suit preceded the earliest possible date (December 20–21, 1974) of any conception of Dayton Reliable's ECO end.

**9.** According to Continental, its decision to use the ECO end was made 1) because Dayton was an established supplier and had produced most of the tooling then being used by Continental; 2) because the ECO end could be made for commercial sale sooner; and 3) because Conti-

That conversion was completed by Dayton Reliable and the tooling shipped to Continental around June, 1976. Continental then began producing and marketing the ECO end, calling it the Pontiac end.

In its introduction of the Pontiac end to the market, Continental advised the industry, through a brochure it distributed at the 1975 National Soft Drink Association convention, that Continental's Pontiac end was the solution to the litter problem. Continental's brochure included the following statements:

> * * * the best compromise between consumer acceptance and cost to produce in *our* effort to provide a solution to the people problem of Ring-Pull litter. It incorporates the best features of existing tab and score technology, and single large opening for good drinking and pour characteristics, and relatively modest capital conversion and running costs. * * * *
>
> The evolutionary process of providing a satisfactory litter-free end has not been simple since there were so many requirements that had to be met. * * * *
>
> With more and more states enacting or considering legislation requiring litter-free ends, shouldn't you be kept abreast of *Continental's* continuing research and development programs?

(Emphasis added)

## A COMPARISON OF THE PATENTS IN SUIT

It is Continental's contention that the ends produced commercially by the parties include many structural differences; that the Continental end was never modified to incorporate features of the SOT end; that the evidence at trial demonstrated that the SOT and ECO ends were conceived and developed independently; and that Fraze, the inventor of the ECO end, had no knowledge of the Reynolds' end like those shown in the '752 and '753 patents prior to the

development of the ECO ends. Rather, contends Continental, it did not copy the SOT end, but produced the ECO end with certain changes as requested by Continental's marketing department and these changes were to features not recited in the claims of the '752 and '753 patents.

■ The evidence at trial, however, clearly and convincingly established that Continental's ECO or Pontiac end is the same as the Reynolds' Stay-On-Tab end, as shown by the following admitted or undisputed facts:

(a) The comparison by Continental's skilled engineers of the Reynolds and ECO (Pontiac) ends established that they involved "virtually the same opening functionality" and that "the only real difference lies in the tab system" because the Reynolds' tab utilizes a second piece of aluminum to secure improved tab non-detachability.

(b) On cross-examination, Fraze admitted that there was lifting of the rivet in the Reynolds' Stay-On-Tab end during opening, just as in the Pontiac end.

(c) Fraze also admitted on cross-examination that the Reynolds' Stay-On-Tab end could be produced on a rotary press of the type utilized by Continental. In fact, Dayton Reliable even went so far as to give Continental an estimate of the cost to convert Continental's rotary presses to produce the Reynolds' end with a tab made of two pieces of aluminum.

(d) Dister, now Vice President of Marketing and Sales for Continental-USA, admitted under cross-examination, that Continental's Pontiac end was "being designed to achieve parity" with the Reynolds' end since Continental was "using both Reynolds and ring pull as our benchmarks."[10]

The numerous changes made to the Pontiac end by Dayton Reliable at Continental's

---

nental did not believe that it could make the two piece tab of the Reynolds' SOT end on the Continental tooling without substantial difficulty and delay.

10. The term "benchmark" as applicable in this context has been defined as "something that serves as a standard by which others may be measured." (Webster's New Collegiate Dictionary, 1979).

request must be evaluated against these admissions by Dister. Additionally, the fact that the ring pull was not a non-detachable opening device and, consequently, was in a different category from the Reynolds' Stay-On-Tab and Pontiac ends must be considered.

In this court's opinion, the evidence established that Continental's Pontiac end was developed in part to fulfill the August 20, 1975 direction of its Metal Operations Steering Committee (MOSC) "to proceed to duplicate the present Reynolds non-detach end."

Additionally, it is worth noting that sometime prior to February 25, 1976, Perry saw the article on the Reynolds' Stay-On-Tab end in the January, 1976 issue of "Modern Packaging." That article included pictures and a description of an opening sequence indicating that the Cudzik device completely forms the pour opening simply by lifting the tab, without requiring any finger push-in action on the tear panel. Perry went to the Reynolds' office in New York City on February 25, 1976 and asked a Reynolds' employee, Thomas J. Young, if he could see one of the new Reynolds' Stay-On-Tab ends referred to in the article in the January, 1976 issue of "Modern Packaging" that Perry had brought with him. Young gave Perry one of the new Reynolds' ends, unopened. After examining it, Perry opened it in the presence of Young. He then asked Young if he could keep it. Young said "no" and Perry left without it.

Having failed to secure an actual Stay-On-Tab end from Reynolds' New York office, Perry called the office of "Modern Packaging" on March 22, 1976. Perry's handwritten notes of that telephone call read: "January issue—article on Reynolds Metals easy open can * * * No samples left on Reynolds—Says Reynolds has literature."

Additionally, the evidence disclosed that all of the major companies in the beverage can industry, except Continental, took licenses under the Reynolds' Cudzik patents in suit. At the present time, there has been a substantial conversion throughout the country to the Cudzik development. Specifically, within the short time span of approximately three years, commercial production of non-detachable easy-opening devices embodying the Cudzik inventions rose from nothing to a 1979 production of such beverage can ends of almost 20 billion. Continental's production of the accused Pontiac end increased from around 200 million in 1976 to over 2 billion for the first six months of 1979, or an annual estimated production rate of over 4 billion for 1979.

The major beverage can and end manufacturers in the United States who have taken a license under the Reynolds' Cudzik patents in suit are as follows: American Can Company, Crown Cork & Seal Company, Inc., and National Can Corporation.[11] Kaiser Aluminum & Chemical Corporation has also taken a license under the Cudzik patents.[12]

Some of the major beverage companies that manufacture their own cans and ends, including Coors Container Company, Miller Brewing Company, and PepsiCo., Inc., have also taken licenses under the Cudzik patents.

The evidence at trial was clear that an acceptable non-detachable opening device fulfilled a long felt need in the beverage can industry, and that those inventions have met with and continue to enjoy substantial commercial success.

## THE SCOPE AND CONTENT OF THE PRIOR ART

The prior art identified by Continental's technical expert, Jacobs, as being most pertinent for the Cudzik inventions is:

---

11. National Can Corporation, one of the major beverage can and end producers in this country, is paying royalties to Reynolds pursuant to a license under the Cudzik patents in suit for production of the Dayton Reliable/Fraze ECO end on Dayton Reliable tooling.

12. Reynolds offered Continental a license but Continental has refused to take one which ultimately led to this lawsuit.

(a) The Perry '011 patent, Figure 28 that issued on Perry's application filed March 2, 1972;

(b) The Khoury United States Patent No. 3,322,296 granted May 30, 1967 (the "Khoury" '296 patent);

(c) The Brown United States Patent No. 3,446,389 granted May 27, 1979 (the "Brown" '389 patent).

Of these three references, Jacobs testified that the Perry '011 patent was the most pertinent.

The Examiner who examined Reynolds' Cudzik patents '752 and '753 is the same Examiner who examined Continental's Perry '976 patent, the Perry '011 patent, the Khoury '296 patent, and the Brown '389 patent.

During the prosecution of its application for the '752 and '753 patents, Reynolds cited twenty-seven prior art references.

### THE PERRY '011 PATENT

The Perry '011 patent and the Brown '389 patent were cited by the Examiner against both the Cudzik '752 and '753 patents in suit, and, the Khoury '296 patent was cited by the Examiner against the Cudzik '753 patent. However, there was no evidence offered at trial demonstrating that Perry's '011 patent was ever put on the market.

On March 2, 1972, Perry filed his patent application Serial No. 231,124 that became the Perry patent No. 3,843,011 granted October 22, 1974 (the '011 patent). The '011 patent is not the Perry '976 patent in suit. Rather, the '011 patent is the parent patent application Perry and Continental need to rely to antedate the Cudzik inventions.

While Perry's 1972 application showed numerous proposed arrangements for a non-detachable easy-opening device for a beverage can, the preferred approach required the use of a finger push-in action on the tear panel portion of the end wall of the can to completely form the pour opening. Thus, Perry's 1972 application followed the conventional thinking at that time, namely,

that the solution to the litter problem would be found in a device requiring a finger push-in action.

In a paper Perry filed in the Patent Office on February 4, 1974, he took the position that "the average person could not exert enough pressure to open" a beverage can with a non-detachable easy-opening device that used a lift tab to press down the entire tear panel and completely form the pour opening without requiring any finger push-in action.

Perry's 1972 application disclosed one species (Figure 20), that did not require a finger push-in action. It did not, however, utilize a lift tab or a score line. Rather, it included a bar that was swivelled on the rivet for rotation about a vertical axis, that is, about the axis of the rivet.

Figure 28 of Perry's 1972 application illustrates the principal embodiment for his 1976 application that became the Perry '976 patent in suit, so it merits close attention. In his 1972 application, Perry disclosed his Figure 28 embodiment as utilizing a lift tab for the purpose of forming a small, venting rupture in the score line near the rivet, followed by a finger push-in action to rupture the remainder of the score line to form the opening.

FIGURE 28

Perry described this figure in his earlier 1972 and 1974 applications as follows:

Fig. 28 is a view of a can top with a segment defined by a score line, and with

leverage means to start fracture of the score line, and push button means to complete the opening operation.

And, in describing the operation of that Figure 28 structure, Perry stated as follows:

The score line is brought very close to the rivet, preferably around it, and legs 194 and 195 of the ring arm press with high leverage against the end of the segment when the ring is raised, causing the score line to break, and the end of the segment to move down. Once fracture occurs, the remainder of the segment is pushed down easily by pressing on button 201.

Continental's technical expert, Charles J. Jacobs, and its patent expert, William Stellman, admitted on cross-examination that actuation of the lift tab of the Figure 28 embodiment in the Perry '011 patent, that issued on his 1972 application, would not completely open the tear panel, but that a finger push-in action on the tear panel's push button would be required for that purpose. Moreover, during the prosecution of the Fraze-owned Brown United States Patent No. 4,030,631, covering the Fraze-Dayton Reliable ECO and Pontiac end (that admittedly came after Cudzik Stay-On-Tab invention), Fraze's attorney stated to the Patent Office that the Figure 28 embodiment of the Perry '011 patent did not provide for complete rupture of the score line around the tear panel simply by actuation of the lift tab.

The Figure 18 embodiment of Perry's 1972 application was also asserted by Perry to be of significance in his '976 patent in suit, so it also merits close attention. In his 1972 application, Perry clearly contemplated that his Figure 18 embodiment, like that of Figure 28, required a finger push-in action on the tear panel to fully or completely open the tear panel. In other words, actuation of the lift tab, alone, would not fully open the tear panel of Perry's Figure 18 embodiment.

FIGURE 18

FIG.18

In the February 4, 1974 paper that Perry submitted to the Patent Office in his 1972 application, Perry included a sketch and description of what he termed "the best design in accordance with my invention". That design included a "mechanical arm of the Fig. 18 type" and a wedge-shaped tear panel having "a narrow inner end positioned at the center of the can top" with the "uncut section for attachment [of the tear panel] to the top * * * along one side, similar to the location of the uncut section in Fig. 28." In operation, Perry said actuation of the lift tab only bends down "the very narrow tip" of the tear panel near the center of the end wall so that completion of the rupture of the tear panel must be accomplished by a finger push-in action on the tear panel. Again, actuation of the lift tab does not fully open the tear panel. Furthermore, in this "best design" for the devices of Perry's 1972 application, he moved the uncut section or hinge for the Fig. 28 type tear panel farther away from the rivet and the lift tab than actually shown in Figure 28 of the drawings for that application, thus emphasizing Perry's 1972 teaching of the need for a finger push-in action to fully open the tear panel.

There was no recognition, therefore, in Perry's 1972 application that a non-detachable easy-opening device could be designed using a commercially acceptable lift tab that was capable, by simple actuation, of completely forming a large, unobstructed

pour opening. To the contrary, Perry expressly taught away from, and deterred any investigation into, that approach, which is particularly illustrated by the statements and arguments presented by Perry in his February 4, 1974 paper.

## THE KHOURY '296 PATENT

The Khoury '296 patent discloses an easy-opening device mounted on the end wall of a can and designed to be removed with the entire end wall in connection with an opening function, as in food or peanut cans now on the market. Khoury's easy-opening device is shown as including a tab having a circular ring connected by a strap to a body member fastened to the container end wall by a rivet integral with the end wall. A C-shaped cut is formed in the body of the tab to provide a hinge axis extending between the apertures in front of the rivet so that when the right of the tab is lifted up, the body of the tab will pivot about that hinge axis. The tip or nose of the tab is arranged directly above a score line that encircles the entire end wall. Thus, upon actuation of the lift tab by pulling up on the right, the tab nose presses and moves down against the score line to initially rupture it, after which the ring is pulled away from the can to effect complete rupture of the score line and removal of the end wall and easy-opening device from the rest of the can. This easy-opening device was designed to be used with cans packed under a vacuum. Khoury, the patentee of this patent, testified at the trial and admitted that the tab of this patent was not designed to be used with a pressurized can, such as a beverage can.

## THE BROWN '389 PATENT

The Brown '389 patent, owned by Fraze of Dayton Reliable, teaches the provision of two tear panels each in the shape of a triangle, formed by score lines. The two tear panels define a pour opening of triangular shape that converges to a sharp point or apex near the periphery of the can end wall. The two converging sides of the triangular opening define hinge or bend lines, that is, lines where the tear panels hinge down into the container while remaining attached to the end wall. Thus the tear panels are opened by rupturing the score lines with the panels bending about their respective hinge lines.

A tab is fastened to the end wall by two rivets, the first being adjacent to the intersection of the score lines, and the second being a vent rivet roughly in the middle of the tab. A U-shaped cut is formed in the tab around the rivet so as to provide a tab hinge axis in front of the rivet. The tab includes a nose located directly above the score line.

Actuation of the lift tab is effective to tear the vent rivet away from the end wall, venting the pressure within the container, and, after continued upward lifting of the tab, to effect a rupture of the score lines and downward bending of the tear panels into the container.

Fraze testified that the structure of the Brown '389 patent was never put on the market. He admitted that some experimental tooling was prepared to make easy-opening devices of that type, but that such tooling wound up in the so-called "morgue" at Dayton Reliable (where they kept their "junk"), and nothing further was done with that structure.

Fraze also admitted at trial that during the initial rupture of the score line in the Brown '389 patented device, the tab functioned as a first-class lever, that is, there is no lifting of the rivet to effect initial rupture of the score line.

## DIFFERENCES BETWEEN THE PRIOR ART AND THE CUDZIK CLAIMS AT ISSUE

Claim 1, one of the independent claims of the Cudzik '752 patent, includes the following limitation:

> ...said attaching means [the rivet] on the end wall being closer to said hinge [the hinge for the tear panel] than to a place on the tear panel where the forward part of the tab is adapted to press initially.

This limitation is directed to the feature that the rivet is closer to the hinge for the tear panel than it is to the place on the tear panel where the nose or front end of the tab presses down when the rear of the tab is lifted up during an opening cycle. In other words, the hinge terminates at the bulbous end of the score line, immediately adjacent the rivet, while the nose or front end of the tab presses down initially on the tear panel at a point farther removed from the rivet than the tear panel hinge.

This limitation is neither shown nor suggested by the Perry '011 patent, the Khoury '296 patent, or the Brown '389 patent. In Perry, the tear panel hinge, 197 of his Figure 28 embodiment, is farther from the rivet than the tip of the tab leg, 195 of Figure 28. In fact, the hinge appears to be almost twice the distance from the rivet as the tip of leg 195. Furthermore, in the February 4, 1974 paper Perry filed in the Patent Office during the prosecution of his 1972 application that issued as his '011 patent, Perry presented a sketch of what he termed the best design according to his invention and in that sketch he moved hinge 197 for the Figure 28 type tear panel *even farther* away from the rivet, as admitted by Continental's technical expert, Jacobs, on cross-examination.

In the Khoury '296 patent, there is no hinge whatsoever for the tear panel since the tear panel is the entire top of the can and the score line completely encircles the can so that the end wall can be completely removed from the can.

In the Brown '389 patent, the hinge or bend lines are at a greater distance from the rivet than the nose or front end of the tab which presses down on the tear panel directly thereunder.

This feature of the '752 Cudzik patent is significant because it enables actuation of the tab to effect propagation or complete rupture of the score line without requiring any finger push-in.

The other independent claim in the Cudzik '752 patent, claim 18, was admitted by Continental to include the same limitation referred to above. Claim 18 further calls for actuation of the tab to cause "propagation of the initial rupturing of the score line away from said tab forward portion and into said generally arcuate section of said score line." This limitation is neither shown nor suggested in the Perry, Khoury, or Brown patents. Specifically, propagation of any initial rupture of the score line into the generally arcuate section of the score line in Perry's Figure 28 embodiment requires a finger push-in action; the Khoury tab, upon actuation, is only capable of forming a limited rupture in the score line and completion of the opening operation requires the user to pull the tab and the entire end wall away from the can to rupture the remainder of the score line; the tear panels in Brown do not include any such arcuate section of the score line connected to two spaced portions of the score line that extend away from the tab, as called for by this claim.

All of the remaining claims asserted from the Cudzik '752 patent in suit depend from either claim 1 or claim 18 so that each dependent claim includes all of the limitations of its respective independent claim, including those referred to above.

Claim 1, one of the independent claims of the Cudzik '753 patent, calls for actuation of the tab to cause "propagation of the initial rupturing of the score line away from said tab forward portion and into said generally arcuate section of said score line." This limitation is neither shown nor suggested in Perry, Khoury, or Brown.

Claim 10, the other independent claim of the Cudzik '753 patent in suit, includes the following limitation:

> ...the forward part of the tab being adapted to press initially against the tear panel at a place farther forward of said axis of pivotal movement [the hinge axis for the lift tab that is disposed right in front of the rivet] than both ends of the [tear] panel hinge.

Neither the Perry '011 patent, the Khoury '296 patent, nor the Brown '389 patent shows or suggests this limitation. Specifically, the tear panel hinge, 197 in

Figure 28, of the Perry '011 patent is farther forward of any hinge axis for the tab 191 than the tip of the tab legs 194, 195; there is no hinge at all for the tear panel in the Khoury '296 patent, as noted above; and the hinges for the tear panels of the Brown '389 patent each extend all the way to the periphery of the can end wall so as to be clearly farther forward of the tab hinge axis than the nose or front end of the tab.

This claimed feature is significant in that it enables actuation of the tab to effect propagation of the initial rupture of the score line of the tear panel into the generally arcuate section of the score line at the periphery of the can end, without requiring any finger push-in action on the tear panel.

All of the remaining claims asserted from the Cudzik '753 patent in suit depend from either claim 1 or claim 10 so that each dependent claim includes all of the limitations of its respective independent claim, including those referred to above.

## LEVEL OF ORDINARY SKILL IN THE PERTINENT ART

The pertinent art to which the Cudzik patents in suit is directed is that of non-detachable easy-opening devices for cans.

The level of skill in that art is that of a person skilled in the industry and is exemplified by the prior art relied on by Continental, namely, the Perry '011 patent and its file wrapper, the Khoury '296 patent, and the Brown '389 patent, as well as the work and actions of the patentees of those patents in the beverage can industry prior to the invention of the Montana end around March-June of 1972, and prior to the invention of the Stay-On-Tab end around October of 1974.

In considering the level of skill in the pertinent art, reference may also be made to the subjective reactions of those persons thoroughly familiar with that art and who practiced that art up to and around the time of the Cudzik inventions. Such persons would include: Perry, Khoury, and Fraze and Brown of Dayton Reliable; the skilled engineers at Continental; and the rest of those in the industry who worked without success on a solution to the litter problem during the time frame of 1965–1975.

For over ten years (around 1965–1975), Fraze, Brown, and other highly skilled personnel at Dayton Reliable struggled without success to invent a commercially acceptable solution for these problems. During that decade, at least eighteen patent applications were filed by Fraze and his associates, directed to their unsuccessful efforts. Then, Dayton Reliable was spurred into activity directed to developing commercial tooling for structures embodying the Cudzik inventions after learning about them from Alcoa and Continental, and after they received actual physical specimens thereof from Continental together with a request for quotation on commercial tooling to produce that end.[13]

Beginning at least as early as about 1966, Continental's top engineers and research personnel turned their attention to these problems. Like Fraze and Dayton Reliable, Continental struggled for approximately ten years without producing a commercially acceptable solution, in spite of "a maximum effort on non-detachable." Over forty United States patents were secured on Continental's unsuccessful efforts. Enormous sums of money were spent in this abortive program for, as noted by Joseph E. Dister, Continental's then Director of Marketing for Beverage Cans: "millions spent and continue to be spent to find a solution" to these problems. Continental's executive vice-president, Fred W. Hoover, Jr., concurred with Dister's appraisal that millions of dollars were spent by Continental on this program.

---

13. Dayton Reliable's first customer for that tooling was Continental and it was used by Continental to produce the Pontiac ends accused herein. National Can Corporation, another customer of Dayton Reliable for similar tooling, took a license from Reynolds under the Cudzik patents in suit and has paid substantial royalties to Reynolds for its production of non-detachable easy-opening devices using such Dayton Reliable tooling.

Continental thought it had the solution in a so-called tape-seal device that included a piece of flexible tape secured to the beverage can end wall and covering a plurality of small holes or apertures in the end wall. The can was opened by pulling up on the tape to uncover the small holes, with the tape designed to stay on the can. Considerable effort was put into making this solution commercial. It was touted in Continental's 1974 Annual Report and Continental sought and secured at least twenty patents for this device. Continental belatedly discovered, however, that (a) the tooling costs needed to embark upon commercial production of that end would be prohibitive, and (b) the industry wanted a single, large pour opening rather than a plurality of small holes. Accordingly, Continental's tape seal device never reached the market in the United States.

The failure of Fraze, Dayton Reliable, and Continental during the period of time around 1965–1975 do not stand alone. Rather, they were typical of the ineffectual efforts of the entire industry.

The thinking in the industry around the late 1960's and early 1970's, as reflected in many United States patents that were sought in that time frame, was that the solution would be found in an easy-opening device that required a *finger push-in action* upon the area forming the pour opening. This thinking was reflected in the push bottom or press tab ends that were placed on the market at that time by American Can Company and Coors Container Company. The finger push-in approach, however, was objectionable and it ultimately failed to have any real impact in the beverage can market in the United States.

## UNOBVIOUSNESS OF THE SUBJECT MATTER OF THE ASSERTED CLAIMS OF THE CUDZIK PATENTS IN SUIT

Neither the Perry, Khoury, or Brown patents, taken alone, discloses or anticipates the subject matter of the asserted claims of the Cudzik patents in suit since each of those patents fails to show or suggest the claim limitations previously discussed.

Continental's position, however, is that the hinged tab of Khoury or Brown may be substituted for the tab 191 in the Figure 28 embodiment of Perry to invalidate the Cudzik claims on the ground that such a modification of Perry would have been obvious to one of ordinary skill in the art at the time the Cudzik inventions were made. Yet, there is no suggestion in Perry, Khoury, or Brown for making such a modification to the Perry Figure 28 structure. To the contrary, the teachings of the Perry, Khoury, and Brown patents, coupled with the statements Perry made to the Patent Office during the prosecution phase of his '011 patent and the testimony of Khoury, Fraze, and Brown relative to the Khoury and Brown patents, would deter any investigation into the combination of these references suggested by Continental. In that regard, the following points are noted:

(a) During the prosecution of the patent application that led to his '011 patent, Perry deterred any investigation into the use of a non-detachable lift tab that would be capable of opening the entire tear panel simply by actuation of the lift tab without requiring any finger push-in action on the tear panel. Thus, to substitute a Khoury or Brown hinged tab for the tab 191 of Perry in his Figure 28 embodiment to achieve complete opening of the tear panel through propagation of the initial venting rupture all the way around the score line by tab actuation, alone, would directly contradict Perry's teachings. Moreover, Perry expressly rejected the Brown tab for use with his structures when he stated to the Patent Office that his "leverage systems [tabs] are novel and differ in principle from that used in Brown '389."

(b) Thus, if one were to change the Perry tab 191 by substituting for it a Khoury or Brown hinged tab, one would have to ignore and go against Perry's express repudiation of the Brown tab or any tab capable of forming the entire opening simply by tab actuation alone. The only suggestion for making such a change to Perry's Figure 28 structure is the Cudzik '752 and '753 patents in suit.

(c) Khoury testified at trial that the tab of his '296 patent was not designed for use on cans packed under pressure, such as beverage cans. Rather, it was designed for use on cans packed under a vacuum, such as food or peanut cans. Hence, the Khoury tab would have had to be redesigned before it could be used with pressurized beverage cans, as admitted by Khoury at trial, and there is no suggestion either in the Khoury or Perry patents as to what changes should be made to the Khoury tab for that purpose.

(d) Fraze admitted at trial that the experimental tooling made by Dayton Reliable for the structure of the Brown '389 patent wound up in Dayton Reliable's morgue and that Dayton Reliable dropped the approach of that patent. Thus, it was nothing more than an abandoned experiment that never reached the market.

(e) The Perry and Brown patents were cited and considered by the Examiner during the prosecution of the Cudzik '752 and '753 patents. The Khoury '296 patent was also cited and considered by the Examiner during the prosecution of the Cudzik '753 patent. The evidence at trial fully and clearly supports the Examiner's refusal to combine those references in the manner attempted by Continental.

■ Accordingly, this court finds that the asserted claims of the Cudzik '752 and '753 patents are valid and enforceable.

## CONCLUSIONS OF LAW [14]

This court has jurisdiction over the parties and the subject matter, and venue is proper.

■ The starting point in any consideration of patent validity is Title 35 U.S.C. Section 282: "A patent shall be presumed valid. * * * The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." And, proof of patent invalidity must be established by clear and convincing evidence. *Malsbary Manufacturing Co. v. Ald, Inc.*, 447 F.2d 809, 812 (7th Cir. 1971); *Ortman v. Maass*, 391 F.2d 677, 681 (7th Cir. 1968); *Walt Disney Productions v. Niles Communications Center*, 369 F.2d 230, 234 (7th Cir. 1966).

■ Where the prior art relied upon for purposes of establishing patent invalidity was actually considered by the Patent Office, the presumption of validity is strengthened. *Ortho Pharmaceutical Corp. v. American Hospital Supply Corp.*, 534 F.2d 89, 93–94 (7th Cir. 1976); *Tracor, Inc. v. Hewlett-Packard Co.*, 519 F.2d 1288, 1306 (7th Cir. 1975); *Ellipse Corp. v. Ford Motor Co.*, 452 F.2d 163, 170 (7th Cir. 1971), *cert. denied*, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972); *LaSalle Street Press, Inc. v. McCormick & Henderson, Inc.*, 445 F.2d 84, 93 (7th Cir. 1971); *TSC Industries, Inc. v. International Harvester Company*, 406 F.2d 53, 57 (7th Cir. 1968). Thus, in the instant case since the Perry '011 patent, the Khoury '296 patent, and the Brown '389 patent relied on by Continental as a defense to the Cudzik '752 and '753 patents in suit, were all cited and considered by the Patent Office during the prosecution of the Cudzik patents, the presumption of validity for the Cudzik patents is strengthened.

On the other hand, where the most pertinent prior art was not considered by the Patent Office, the presumption of validity is weakened and can be entirely dissipated. *Chicago Rawhide Manufacturing Co. v. Crane Packing Co.*, 523 F.2d 452, 458 (7th Cir. 1975), *cert. denied*, 423 U.S. 1091, 96 S.Ct. 887, 47 L.Ed.2d 103 (1976); *Alcor Aviation, Inc. v. Radair Incorporated*, 527 F.2d 113, 115 (9th Cir. 1975); *Deere & Company v. Sperry Rand Corp.*, 513 F.2d 1131, 1132 (9th Cir. 1975), *cert. denied*, 423 U.S. 914, 96 S.Ct. 218, 46 L.Ed.2d 142 (1975); *Garrett Corporation v. American Safety Flight Systems, Inc.*, 502 F.2d 9, 12 (5th Cir. 1974); *Layne-New York Co., Inc. v. Allied Asphalt Co., Inc.*, 501 F.2d 405, 407 (3d Cir. 1974), *cert. denied*, 421 U.S. 914, 95 S.Ct. 1572, 43

---

14. Any conclusion of law which may be more properly termed a finding of fact shall be deemed a finding of fact.

L.Ed.2d 780 (1975); *Henry Manufacturing Co., Inc. v. Commercial Filters Corporation,* 489 F.2d 1008, 1013 (7th Cir. 1972).

■ A prior patent or other publication to be an anticipation under 35 U.S.C. Section 102(a) and (b) must bear within its four corners adequate directions for the practice of the patented subject matter sought to be invalidated. If the earlier disclosure offers no more than a starting point for further experiments, if its teaching will sometimes succeed and sometimes fail, if it does not inform the art, without more, how to practice the new invention, it has not correspondingly enriched the store of common knowledge, and it is not an anticipation. *General Foods Corp. v. Triangle Mfg. Co.,* 253 F.2d 227, 230 (7th Cir. 1958); *Dewey & Almy Chemical Co. v. Mimex Co.,* 124 F.2d 986, 989 (2nd Cir. 1942). Thus, neither the Perry '011 patent nor the Khoury '296 patent nor the Brown '389 patent anticipates the asserted claims of the Cudzik patents in suit.

■ The question of obviousness under 35 U.S.C. Section 103 is determined by the scope and content of the prior art, and the differences between the prior art and the claims at issue. The level of ordinary skill in the pertinent art must also be resolved. Against this background, the question of obviousness or non-obviousness of the claimed subject matter is decided. *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). The usual way of determining "the level of ordinary skill" in a particular art is by referring to the subjective reaction of a person thoroughly familiar with the particular art and, if possible, one who practiced the art at the crucial time in question. *Malsbary Manufacturing Co. v. Ald, Inc., supra,* 447 F.2d at 811. For determining the level of the skill in this particular art, reference may be made (a) to the Perry '011 patent and to the statements made by Perry to the Patent Office during the prosecution of the application that issued as that patent; (b) to the actions of Khoury relative to the question of using the tab of his '296 patent on a beverage can prior to the Cudzik inven-

tions; (c) to the actions and statements of Fraze and Brown relative to the structure disclosed in the Brown '389 patent; and (d) to the actions of the skilled engineers at Continental and in the rest of the industry during the relevant time period.

■ Secondary tests are also applicable to give light to the circumstances surrounding the patented subject matter and have relevancy to the determination of obviousness. *Graham v. John Deere Co., supra,* 383 U.S. at 17–18, 86 S.Ct. 693–694. In the instant case, (1) the patented Cudzik inventions filled a long-felt need in the industry. See, *Ortho Pharmaceutical Corp. v. American Hospital Supply Corp., supra,* 534 F.2d at 93; *Rex Chainbelt, Inc. v. General Kinematics Corporation,* 363 F.2d 336, 337 (7th Cir. 1966); (2) the patented Cudzik inventions met with substantial success upon their introduction to the market. See, *Ortho Pharmaceutical Corp. v. American Hospital Supply Corp., supra,* 534 F.2d at 93; *Rex Chainbelt, Inc. v. General Kinematics, supra,* 363 F.2d at 337; *Continental Can Co. v. Anchor Hocking Glass Corp.,* 362 F.2d 123, 123 (7th Cir. 1966); (3) Continental's attack upon the Cudzik inventions as being "obvious" is viewed from the benefit of hindsight. See, *Ellipse Corp. v. Ford Motor Co., supra,* 452 F.2d at 170; *Walt Disney Productions v. Niles Communications Center, supra,* 369 F.2d at 234; (4) the accused infringer, Continental, itself, recognized that the Cudzik inventions were meritorious. See, *AMP Incorporated v. Molex Products Co.,* 329 F.Supp. 1364, 1371 (N.D. Ill.1971).

■ In the instant case, this court's finding of non-obviousness is strengthened by secondary evidence that nearly all members of the industry took licenses under the patent rights in suit. *Wahl Clipper Corporation v. Andis Clipper Co.,* 66 F.2d 162, 165 (7th Cir. 1933); *Columbia Broadcasting System, Inc. v. Zenith Radio Corp.,* 391 F.Supp. 780–789 (N.D.Ill.1975), *modified,* 537 F.2d 896 (7th Cir. 1976). See also, *Tights, Inc. v. Acme-McCrary Corp.,* 541 F.2d 1047, 1059 (4th Cir. 1976), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976). Here

nearly the entire industry (not counting Continental) has taken licenses from Reynolds under the Cudzik patents in suit and has not taken a license from Continental under the Perry patent in suit.

The prior art Perry, Khoury, and Brown patents, relied on by Continental, fail to render obvious the subject matter of the claims in issue of the Cudzik '752 and '753 patents. Among other things, there was no evidence that the key Figure 28 embodiment of the Perry '011 patent was ever put on the market by anyone.

■ With respect to the Khoury '296 patent, the patentee Khoury testified that he had attempted to use the tab of that patent on a beverage can prior to the Cudzik inventions, but his efforts were without success and he dropped the idea. Finally, with respect to the structure of the Brown '389 patent, the testimony at trial established it was never put on the market and the tooling for it wound up in Dayton Reliable's "morgue" which was where they put their "junk". Such unsuccessful attempts are nothing more than abandoned experiments that in no way enrich the store of common knowledge available to inventors at the time they conceive their inventions. *Illinois Tool Works, Inc. v. Continental Can Company*, 273 F.Supp. 94, 109–110 (N.D.Ill.1967), *aff'd* 397 F.2d 517 (7th Cir. 1968). "Patents for useful inventions ought not to be invalidated and held for naught because of such excursions into the boneyard of failures and abandoned experiments." *Reynolds v. Whitin Mach. Works*, 167 F.2d 78, 84 (4th Cir. 1948), *cert. denied*, 334 U.S. 844, 68 S.Ct. 1513, 92 L.Ed. 1768 (1948).

Measured by the foregoing tests, the subject matter of the claims at issue from the Cudzik '752 and '753 patents was not obvious at the time the inventions were made to those skilled in the art, particularly as to Continental who found it necessary to base the development of its commercial Pontiac end on the Reynolds' Stay-On-Tab end. *Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc.*, 436 F.2d 1180, 1186 (7th Cir. 1971), *cert. denied*, 403 U.S. 942, 91 S.Ct. 2270, 29 L.Ed.2d 722 (1971).

■ A continuation application is one that is filed during the pendency of an application previously filed by the same inventor, called the original or "parent" application, and which discloses and claims only subject matter disclosed and claimed in the original or parent application. A continuation-in-part application, on the other hand, is an application that is filed during the pendency of the original or parent application of the same inventor, disclosing and claiming some subject matter common to the parent application, as well as some subject matter not common to and not supported by the parent. The common subject matter is entitled to a filing date of the parent application while the non-common subject matter, i. e., new matter, is only entitled to the actual filing date of the later filed continuation-in-part application. 35 U.S.C. Section 120; Manual of Patent Examining Procedure, Sections 201.07, 201.08. *Bendix Corporation v. Balax, Inc.*, 421 F.2d 809, 816–817 (7th Cir. 1970), *cert. denied*, 399 U.S. 911, 90 S.Ct. 2203, 26 L.Ed.2d 562 (1970); and *General Foods Corporation v. Perk Foods Co.*, 419 F.2d 944, 948–49 (7th Cir. 1970), *cert. denied*, 397 U.S. 1038, 90 S.Ct. 1357, 25 L.Ed.2d 649 (1970).

Thus, if an application is, in fact, a true continuation application, it is entitled to the filing date of the original or parent application. If, however, it discloses and claims subject matter not common to or not supported by the parent application, it is not a true continuation application and any claims therein that include new matter are only entitled to the actual filing date of the later-filed application, and not the earlier parent application.

While Perry called his August 9, 1976 application (that issued as the Perry '976 patent in suit) a continuation application, forty-seven of the fifty claims in that patent, namely claims 1–15, 17–27, and 29–49 include new matter so as to be entitled only to the filing date of August 9, 1976. Thus, Perry's 1976 application was a continuation-in-part and not a continuation of his earlier 1974 application and the Cudzik '752

and '753 patents are available as prior art against the aforesaid forty-seven claims.

With respect to the question of new matter in the Perry '976 patent in suit, it should be noted that Perry's August 9, 1976 application (that issued as that patent) was filed after Perry had seen the Cudzik Stay-On-Tab end in an article in the January, 1976 issue of *Modern Packaging* and after Perry had seen an actual Stay-On-Tab end in the Reynolds' New York office in February, 1976.

It is appropriate, therefore, to give particular attention to Perry's earlier 1972 and 1974 applications in determining that his 1976 application embodied new matter, that is "material addition[s] to or variance[s] from the original" that "cannot be sustained on the original application."

Perry was attempting to enlarge the scope of his 1972 and 1974 application disclosures of Figure 28 in an effort to appropriate to himself the Cudzik inventions. The courts have consistently rejected such attempts, regarding them with "jealousy and disfavor," as mandated by the Supreme Court in *Chicago and Northwestern Railway Co. v. Sayles*, 97 U.S. 554, 563, 24 L.Ed. 1053 (1878). See also *Atlantic Works v. Brady*, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438 (1883); *Powers-Kennedy Contracting Corp. v. Concrete Mixing and Conveying Co.*, 282 U.S. 175, 186, 51 S.Ct. 95, 99, 75 L.Ed. 278, 286 (1930); *Insulite Co. v. Reserve Supply Co.*, 60 F.2d 433, 434–436 (8th Cir. 1932); *Lopulco Systems, Inc. v. Bonnot Co.*, 24 F.2d 510, 512 (3rd Cir. 1928); *Hestonville M. & F. Pass. Ry. Co. v. McDuffee*, 185 Fed. 798, 802–804 (3rd Cir. 1910), *cert. denied*, 223 U.S. 719, 32 S.Ct. 523, 56 L.Ed. 629 (1911); and *Crown Machine & Tool Co. v. K V P–Sutherland Paper Co.*, 297 F.Supp. 542, 566–568 (N.D.Ca.1967), *aff'd*, 409 F.2d 1307 (9th Cir. 1969), *cert. denied*, 396 U.S. 824, 90 S.Ct. 66, 24 L.Ed.2d 75 (1969).

█ The asserted claims 1–2, 4–6, 8–11, 14–15, 17–19, 23–25, 27, 29–32, 34, 35, 38 and 39 of the Perry patent in suit, containing new matter, were derived by Perry from his exposure to the Cudzik inventions and are invalid under 35 U.S.C. Section 102(f) since Perry did not himself invent the subject matter thereof.

█ Applicants for patents have an uncompromising duty to report to the Patent Office all relevant facts concerning the applications in issue. *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945); and *Norton v. Curtiss*, 433 F.2d 779, 794 (CCPA 1970).

█ If one claim of a patent is invalid through failure of the applicant to disclose information to the Patent Office that is known to be material to the examination of the application, the entire patent is invalid and unenforceable. *Marconi Wireless Telegraph Co. of America v. United States*, 320 U.S. 1, 58, 63 S.Ct. 1393, 1419, 87 L.Ed. 1731 (1943); *Strong v. General Electric Co.*, 434 F.2d 1042, 1045–1046 (5th Cir. 1970), *cert. denied*, 403 U.S. 906, 91 S.Ct. 2207, 29 L.Ed.2d 681 (1971); *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 428 F.2d 555, 564–566 (5th Cir. 1970), *cert. denied*, 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264 (1970).

█ In the instant case, the record disclosed that Perry failed to make material disclosures to the patent office concerning his prior knowledge of the Cudzik patents.

█ Experimental use of an invention or use solely to test the qualities of the invention is permitted, including showing the invention publicly and/or to others in the industry, in connection with efforts to bring the invention to acceptable form, and such use does not start the statutory one-year period under 35 U.S.C. Section 102(b). *City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126, 133–134, 24 L.Ed. 1000 (1878); *In re Yarn Processing*, 498 F.2d 271, 280–281 (5th Cir. 1974), *cert. denied*, 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974); *Cloud v. Standard Packaging Corporation*, 376 F.2d 384, 390 (7th Cir. 1967); *George R. Churchill Company v. American Buff Co.*, 365 F.2d 129, 133–134 (7th Cir. 1966); and *Watts v. The*

*University of Delaware*, 471 F.Supp. 1272, 1279 (D.Del.1979).

The use of the Montana end prior to December 4, 1973 was experimental and solely to test the qualities of the invention so as not to constitute prior art against the claims of the Cudzik '752 patent.

■ To establish double patenting between two patents issued to the same inventor at different times, only the claims are compared, and there is no double patenting if the claims are each for a specific different combination of elements wherein each claim contained limitations not found in the other, and further wherein the claim in the later patent showed an invention beyond the claim of the first patent and could be practiced without infringing the claim of the earlier patent. *J. R. Clark Company v. Jones & Laughlin Steel Corp.*, 288 F.2d 279, 281 (7th Cir. 1961), *cert. denied*, 368 U.S. 828, 82 S.Ct. 49, 7 L.Ed.2d 32 (1961); *The Weatherhead Company v. Drillmaster Supply Company*, 227 F.2d 98, 102 (7th Cir. 1955); *W. Briggs v. M & J Diesel Locomotive Filter Corp.*, 288 F.Supp. 26, 39–40 (N.D.Ill.1964), *aff'd* 342 F.2d 573 (7th Cir. 1965), *cert. denied*, 382 U.S. 801, 86 S.Ct. 1, 15 L.Ed.2d 55 (1965); *Ruben v. Ariston Laboratories, Inc.*, 40 F.Supp. 551, 570 (N.D.Ill.1941). Furthermore, the defense of double patenting carries with it a heavy burden of proof and all reasonable doubts must be resolved in favor of the validity of the challenged patent. *TSC Industries, Inc. v. International Harvester Company, supra*, 406 F.2d at 57 (7th Cir. 1968). In the instant case, Continental's defense of double patenting as to claim 1 of the Cudzik '753 patent fails.

The Cudzik patents in suit, Nos. 3,967,752 and 3,967,753, are valid and the asserted claims thereof, namely, claims 1–3, 5–6, 8–13, 16–21, 24, 29, and 31 of the '752 patent and claims 1–4, 7–8, 10–12 and 14–15 of the '753 patent are valid and enforceable.

The Perry patent in suit No. 4,051,976 is invalid and null and void and all of the claims thereof are invalid and unenforceable.

■ To establish infringement of a product patent, the patent owner must demonstrate that the alleged infringer has made, used or sold the product coming within the scope of the claimed inventions. *Reese v. Elkhart Welding & Boiler Works, Inc.*, 447 F.2d 517, 527 (7th Cir. 1971) and *University of Illinois Foundation v. Block Drug Co.*, 133 F.Supp. 580, 584 (E.D.Ill. 1955), *aff'd* 241 F.2d 6 (7th Cir. 1957), *cert. denied*, 354 U.S. 922, 77 S.Ct. 1382, 1 L.Ed.2d 1437 (1957). Infringement is not avoided where the infringer makes out of one piece of metal a component of the patented device that is shown in the patent as being made of two pieces of metal, where the asserted claims do not require that component to be made of two pieces. *Zysset v. Popeil Brothers, Inc.*, 276 F.2d 354 (7th Cir. 1960), *cert. denied*, 364 U.S. 826, 81 S.Ct. 62, 5 L.Ed.2d 54 (1960):

> Infringement is not avoided by making into one part that which has been shown as two where there is no change in the function or manner of operation of the element.

276 F.2d at 357.

Continental's Pontiac end infringes and is covered by each of the asserted claims of the Cudzik '752 and '753 patents in suit.

Reynolds' Stay-On-Tab end does not infringe and is not covered by any of the asserted claims of the Perry '976 patent in suit.

■ Reynolds' counterclaim seeking invalidity of the Perry patent in suit as an interfering patent under 35 U.S.C. Section 291 is dismissed as moot, without prejudice to the Cudzik patents in suit because the claims of the Perry patent are otherwise invalid and unenforceable and do not cover the Reynolds' Stay-On-Tab end. It is finally ordered that Continental be and it is hereby enjoined from any further infringement of the Cudzik patents in issue.